JOSEPH P. DONAHUE v. NORTHWESTERN TELEPHONE EXCHANGE COMPANY.[1]

February 28, 1908.

Nos. 15,460—(185).

**Failure to Direct Verdict—Instructions Immaterial.**

In an action to recover damages caused by the alleged negligence of the defendant, the defendant at the close of the evidence moved for a directed verdict, which was denied.    The jury returned a verdict in favor of the defendant.    A motion for a new trial, made by the plaintiff on alleged errors in rulings upon questions of evidence and erroneous instructions to the jury, was denied by the trial court.    *Held*, that the motion to

[1] Reported in 115 N. W. 279.

direct a verdict should have been granted, and that the correctness of the instructions is therefore immaterial.

Action in the district court for Ramsey county to recover $5,000 damages for the death of plaintiff's intestate. The case was tried before Orr, J., and a jury which returned a verdict in favor of defendant. From an order denying his motion to set aside and vacate the verdict and for a new trial, plaintiff appealed. Affirmed.

This was an action to recover damages for personal injuries alleged to have been occasioned by the negligence of the defendant. The jury returned a verdict in favor of the defendant, and the plaintiff appealed from an order denying his motion for a new trial.

The plaintiff is the administrator of Jeffrey J. Donahue, who was killed on September 24, 1905, while in the employ of the Northwestern Telephone Exchange Company. The telephone company was engaged in constructing a telephone line, which intersected a line of wires of the St. Croix Power Company, over which a powerful current of electricity was transmitted from Apple River, Wisconsin, to St. Paul, where it was used for lighting purposes. At the place of intersection the power company's wires were carried considerably higher than the telephone company's wires. The power company's line crossed the highway and passed over the telephone company's wires. One of the power company's poles stood within the limits of the highway and just north of the southerly boundary thereof. The next pole to the north of that was somewhat northerly of the north boundary of the highway, making a span of about sixty feet. As then arranged, had one of the high tension wires of the power company been broken, it might have come in contact with the telephone wires of the defendant company and caused great damage.

For the purpose of avoiding this danger, the telephone company was engaged in the work of making a "short span," so that the distance between the poles would be less than the difference between the height of the high tension wires and the telephone wires. The post north of the highway was to be moved southerly toward the telephone lines a distance of sixteen inches. This was to be done without taking the pole down, by simply digging the required dis-

103 M.—28

tance on the south side and moving the post, as in a ditch, while it was in an upright position. A new pole was to be set in the highway on the other side, or south of the defendant's line. The poles of the power company were forty five feet long, and were set in holes about six and one half feet deep. The highway seems to have been about fifty six feet wide. The old span in the power company's line between the pole near the south side of the highway and the pole just north of the highway was about sixty feet long. The southerly pole is referred to in the evidence as "pole A," and the northerly pole is called "pole B." The new hole for pole B is referred to in the evidence as "hole D," and the hole in the highway for the new pole for the short span is referred to as "hole E." The short span had not been put in when the work was originally done, because it was necessary to have the current from the power company's wires shut off, and this could only be done on Sunday, when the demand for the power for heating and lighting purposes was less than during the week.

The organization of the crew having the work in charge seems to have been as follows: Buchholz was general foreman, Aldridge was foreman, Johnson was assistant foreman, Brickley was a lineman, Montgomery was a laborer engaged in digging the holes, Ripsom was a lineman, and Donahue, the deceased, was a groundman. This crew lived in a camp about a mile and three-quarters west from the place of the accident, and it is clear that they were all aware of the fact that the power company's line carried a powerful current of electricity. They had for some time been working in the vicinity, and mere observation was sufficient to notify any intelligent man, especially one familiar with electrical matters, of the character of the power company's line. It carried six large high tension copper wires, each about half an inch in diameter. The poles were heavy and high. The cross-arms were strong and well set. The insulators of the high tension wires were about the size of a man's hat, while the wires and insulators of ordinary telephone and telegraph lines are much smaller. The voltage on the high tension wires of the power company seems to have been frequently discussed by the men of the crew in the presence and hearing of Donahue, and it was variously stated that the voltage was from thirty thousand to forty thousand.

Some days prior to the accident Buchholz arranged with the superintendent of the power company for making the short span in the power company's line. The power company was to furnish all the material, handle its own wires, and shut off its own current. The date of doing the work was left to the power company's lineman, Hilton, who had charge of the line in question. Buchholz saw Hilton, and it was determined that the work should be done on Sunday, September 24. Hilton was to leave St. Paul on the eight o'clock car, and go to the camp of the telephone company, and from there to the place where the work was to be done. He was to bring a test set, and when the work had been so far completed that nothing was left to be done except to move the poles, he would climb one of the power company's poles and by means of his portable telephone notify the power company at its headquarters to shut off the current. Thereafter, immediately and with as little delay as possible the short span was to be installed and the current again turned on. Eight days before the accident this arrangement was fully explained by Buchholz to Aldridge at the camp, in the presence and hearing of Donahue; and Ripsom, the other man who was killed, also knew of the arrangement.

Two or three days before the accident Buchholz and Ripsom measured the pole A and the pole B, and marked the measurements on each pole on its face toward the road in blue pencil marks. Some time prior to the day of the accident the new forty-five foot pole was brought to be inserted in hole E. The holes were also partially dug. On the afternoon of the Saturday preceding the date of the accident the foreman, Aldridge, learned that on account of sickness in his family he could not be present. He thereupon instructed the assistant foreman, Johnson, with respect to the work, and cautioned him about doing anything, except to finish the digging of the holes, before the arrival of Hilton, the power company's lineman. One witness testified that Johnson was ordered not to leave the camp until after Hilton had done his work. Donahue was present with Aldridge when Aldridge thus instructed Johnson. Donahue was present when Aldridge talked with Johnson about doing the work. Donahue seems to have been present when it was explained that Hilton would come

out on the eight o'clock car, and that he would ·go to the line and turn. off the current in' the power company's wires. Donahue also heard Aldridge tell Johnson not to do anything, but to finish digging the holes and frame the poles, before the arrival of Hilton.

On Sunday morning the defendant's crew went from the camp to the place of the accident on a wagon, and without waiting for the arrival of Hilton they proceeded at once to the work. Johnson, who was in charge of the. work, directed Ripsom and Donahue to get their framing tools and cut the required notches in the pole which was to be used in making the short span. The pole was then lying on the ground. Ripsom and Donahue, for the purpose of ascertaining where to cut the notches, undertook to measure the pole of the power company which was already erected and holding the wires. They went to the defendant's tool box and got a tape measure. In its proper and natural condition this tape was not adapted for the purpose, and Ripsom and Donahue, made a hook from a piece of telephone wire and attached it to the end of the tape. Taking hold of the hook, Ripsom started to climb the pole for the purpose of making the measurement. Donahue remained on the ground and unwound the tape from the circular case as Ripsom ascended the pole. The foreman, Johnson, ordered Ripsom not to go up the pole, as he might be injured or killed. The same warning was given him by Brickley. The order was disobeyed, and the warning disregarded. Ripsom ascended the pole and attempted to throw the hook over the power company's wire. Donahue was on the ground, holding the other end of the tape. As the hook approached the wire, there was a flash, and both men were instantly killed. The tape they were using contained ten or twelve small wires, which made it a conductor of electricity. Ripsom and Donahue knew that the power company's wires carried a tremendous voltage of electricity. The appellant claims that they must have believed that the power had been shut off, while the respondent claims that it conclusively appears that they knew that the power was still on, and that they relied upon the fact that the tape was a nonconductor, and carelessly failed to learn the true character of the tape.

*P. D. Scannell* and *Morton Barrows,* for appellant.
*Cobb & Wheelwright* and *How, Butler & Mitchell,* for respondent.

ELLIOTT, J. (after stating the facts as above).

It is alleged in the complaint that the defendant was negligent in failing to furnish Donahue with a safe place to work and with proper instrumentalities, and to instruct and warn him of the dangers of the service he was called upon to perform.   Plaintiff's case rests upon the allegations:   (1) That Donahue was an inexperienced workman, and was put at work which was more hazardous than that for which he had been employed, without proper instructions; (2) that the usual way of measuring the height of wire above the ground was by means of a tape and wire hook attached thereto, which was slipped along the wire from the hole to the point measured; (3) that pursuant to this custom, under defendant's directions, the lineman, Ripsom, climbed the pole with the tape and hook attached to make the measurements, and that Donahue stood near the foot of the pole holding the tape, with the intention, as he had been directed to do, of slipping the same along the wire to a point immediately above where the hole was to be dug, and then making the measurement; (4) that Donahue did not know that the current was on the power company's wires; (5) that Donahue was directed to make the measurement with the tape in question in the manner described; and (6) that Donahue did not know that the tape was a conductor of electricity, which fact was known to the defendant.

The record fails to disclose any evidence which even tends to support a single one of these allegations, and the plaintiff is driven to rely upon a charge of negligence which is not alleged in the complaint.   It is contended that, regardless of all these matters, the defendant is liable because the foreman, Johnson, knowing that the current was on the power company's wires, stood by and failed to warn Donahue and direct him to drop the tape.   Leaving this claim for the present, we will examine the evidence bearing upon the allegations of the complaint.

1. Donahue was a man of mature years, who had been engaged in similar work for at least fourteen years.   He had been working

for the telephone company a little more than a year, prior to which he had worked for the Western Union Telegraph Company as a laborer and lineman for about twelve years. The witness Webster, who was called by the plaintiff as an expert, testified that Donahue's experience in line work had been about as extensive as his own. The evidence does not show that Ripsom and Donahue were engaged in measuring the height of the wire above the ground in the usual and customary way. In fact, we do not find a word of evidence which tends to show that any such custom or method existed. There is no evidence tending to show that Donahue was ever hired or directed to aid Ripsom in making the measurement in the manner described. On the contrary, it appears that no such measurement was necessary, and that the assistant foreman, Johnson, expressly forbade the men to make the measurement, or to do what they were attempting to do when the accident occurred.

Johnson was called by the plaintiff, and cross-examined under the statute; but his evidence in this respect is undisputed. He testified that, when he saw Ripsom and Donahue preparing the tape line, he said to them, "What are you going to do?" They were standing right alongside of me, about four or five feet away from me. * * * They said they were going to measure the pole. I thought they were going to measure that new pole that was lying on the ground. Instead of that, why, they walked over to this pole where the accident happened. * * * They walked half way over to the pole, and I says, "What are you going to do?" They says, "We are going to measure that pole." I says, "Never mind, that pole don't have to be measured." * * * And Donahue turned around, kind of laughing at me, and he walked over towards the pole. Ripsom got over towards the pole with his—I don't know if it was the right or left—foot on the pole. I says to him, "Don't go up on the pole." So he started off. He got half way on the pole. I called him again. I says, "Ripsom, whatever you do, don't go up on the pole." I says, "If you do, you will get killed," and he turned around, looked at me in kind of a laughing way, and he answered me just like this, "To hell; I've seen them wires before I seen you." So he walked up on the pole near to the wire.

At another time the same witness testified as follows: "I seen them going. I says to one of them, 'What are you going to do?' He says, 'We are going to measure that pole.' * * * They went over towards that pole * * * A. They must have been about ten or twelve feet away from me. Probably not that far, I don't remember. Then I says, 'Stay off of them poles, stay away from them poles.' They kept on going. When I spoke to him that way Donahue turned around in a laughing kind of way. * * * He didn't say nothing; but he turned around, kind of turned his head, in a laughing way. * * * I didn't mention Ripsom or Donahue. They were both together there when I spoke."

Again he testified: "I spoke to them again when Ripsom got over to the pole. He stuck his foot on the pole, and was going to start to go up the pole. I spoke to him, and I says, 'Stay off that pole.' So he started up, got half way up the pole, and I spoke to him again. I says, 'Come off that pole.' I says, 'If you don't come down, you will get killed.' "

The witness Brickley testified that as Ripsom started up the pole, he said to him: " 'Ripsom, I wouldn't go up that pole if I was you.' He never said anything, and he went up a little farther, and I says: 'I wouldn't climb that pole if I was you. I would wait until Hilton comes out; for he is going to bring his test set, and tell them when to shut the power off.' He paid no attention to me, and he got up a little farther, and I says, 'If you go up that pole you are all insky,' and he turned around and kind of laughed at me." Donahue was then standing twenty or twenty five feet from Brickley, and must have heard all that was said. There can be no reasonable doubt of it. The witness Montgomery testified that he heard Johnson and Brickley tell the men to "keep away from that pole."

Johnson was the foreman, and the men should have obeyed him. His statements were certainly sufficient to warn them of danger and relieve the defendant from responsibility for the results of their action, unless there was hidden danger which was known to Johnson, and not to Ripsom and Donahue. The danger was from the current in the power company's wires, and a reasonably prudent man would have ascertained whether it was in fact on or off before taking

such risks. Both Ripsom and Donahue knew that it was the intention of the defendant that the power should be turned off before the work was done. Johnson had been instructed by Aldridge to go out and finish the holes, frame the poles, and get ready to set the poles when the power company shut off the current. Johnson says that he was told not to go near the poles before the power company man got there. Brickley testified that Aldridge told Johnson not to leave camp until Hilton came out to shut off the power. These instructions were given the evening before the accident, when the men were standing around. Johnson says that Donahue was about thirty feet away. Aldridge testified that, when he gave the instructions to Johnson, "Donahue was there with me, because I was talking to him and talking with Johnson at the same time." Ripsom was not then present. Donahue knew that the current was to be cut off before the work was done. If Ripsom and Donahue had thought that the power had been shut off, they were informed to the contrary by Brickley, and Johnson's language could have conveyed no other meaning. Nor does the evidence show that it was necessary to take the measurements. At most, Ripsom and Donahue set their judgment as to the necessity against that of the foreman, and refused to obey his positive and imperative instructions. The height had already been measured, and the results marked on the poles, by Buchholz and Ripsom. This had been done two or three days before the accident, and it is reasonably clear that the fact was known to Donahue.

There is no direct evidence that any one knew that the tape was shot through with fine metallic wires. Upon the base of the tape, on the last part which would leave the box when it was unrolled, were printed the words "metallic tape." The metallic fibers were visible upon even a slight examination. It certainly would not have been a reasonably safe appliance to furnish to the men for use in the way it was being used by Ripsom and Donahue. The tape belonged to a workman named Montgomery, and for a time was used by him in measuring holes. One day Johnson borrowed it, and after he got through with it put it in the tool box, where it remained, and thereafter was used by the men in and about the construction work. It

may thus be said that the company adopted it and authorized its use for proper purposes; but it cannot be inferred that the use to which it was put was within the contemplation of the defendant. The tape was not in the least adapted to such use, and had to be fixed up so that it could be used in that way. It was a device improvised by Ripsom and Donahue for their purpose. If a tape with a hook on the end for the purpose of being connected with overhead wires was to be used, it would, of course, have been negligence to furnish a metallic tape; but a metallic tape was perfectly proper for measuring holes and timber, and this was all it had ever been used for, so far as the evidence discloses. Metallic appliances are used about such construction work, and are perfectly safe and proper when used for the purposes contemplated. There is no escaping the conclusion that Ripsom and Donahue were using this tape for purposes not contemplated by the defendant, and in a manner and under circumstances which could not be reasonably anticipated. The metallic character of the tape is apparent from the slightest inspection, and for two men, familiar with the dangers connected with work around electrical machinery and appliances, to use such a tape for such a purpose under the circumstances, without first investigating and determining that it was a nonconductor, was an act of negligence which in itself would preclude recovery. When we also remember that the men were connecting themselves with a high tension wire, in the face of immediate warning and in opposition to direct orders, it is very clear that the jury reached the proper conclusion.

2. Plaintiff cannot recover on the so-called subsequent negligence of the defendant in failing to order Donahue to drop the tape after Ripsom started up the pole, if for no other reason, because the facts are not pleaded. The complaint does not allege any negligence in this respect. Connelly v. Minneapolis Eastern Ry. Co., 38 Minn. 80, 35 N. W. 582; Morrow v. St. Paul City Ry. Co., 65 Minn. 382, 67 N. W. 1002; Jemming v. Great Northern Ry. Co., 96 Minn. 302, 305, 104 N. W. 1079, 1 L. R. A. (N. S.) 696.

3. As the plaintiff had failed to prove the case which he had pleaded, the trial court should have directed a verdict in favor of the defendant; and a new trial was properly denied after the jury had

returned a verdict in favor of the defendant on the merits. The alleged errors in the instructions become immaterial and need not be considered. This is also true of the alleged errors in the rulings upon the reception and rejection of evidence, unless the result was to exclude competent and material evidence which, if it had been received, might have required the case to go to the jury and possibly resulted in a different verdict. The evidence which it is claimed was improperly received was of little, if any, consequence. The cross-examination of the witness Aldridge, even if erroneous, was not prejudicial.

The fifth assignment of error, based upon the ruling which sustained the defendant's objection to a question which asked the witness to state the customary method of making measurements, was well taken. The plaintiff was claiming that it was necessary to measure the height of one of the poles in order to carry out the instruction to notch the pole which was then lying on the ground; but the witness had already testified that he did not know that it was customary to measure the height in any other way than by observations. The witness had also testified that he did not know what the custom was as to obtaining the height of the wires, when new poles were being set under conditions such as were being considered. In view of the condition of the entire record, it is evident that the plaintiff was not prejudiced by the ruling which prevented the witness from answering the particular question.

The seventh, eighth, ninth, tenth, and eleventh assignments are predicated upon rulings which prevented a witness from answering questions designed to establish the necessity for making the measurement; but it was not, under the circumstances, for Ripsom and Donahue to determine this question of necessity. That rested with the foreman, and he expressly ordered the men not to make the measurements. The sustaining of the objection to the question referred to in the twelfth assignment was in no way prejudicial to the plaintiff. All that the foreman, Johnson, said had been detailed over and over by witnesses called by the plaintiff.

The order of the trial court is therefore affirmed.